**Gilbert NIETO, Petitioner–Appellant,**

v.

**George SULLIVAN,
Respondent–Appellee.**

**No. 87–1981.**

United States Court of Appeals,
Tenth Circuit.

June 26, 1989.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M., for petitioner-appellant.

William McEuen, Asst. Atty. Gen., Santa Fe, N.M. (Hal Stratton, Atty. Gen., Santa Fe, N.M., was also on the brief) for respondent-appellee.

Before HOLLOWAY, Chief Judge, and SEYMOUR and EBEL, Circuit Judges.

HOLLOWAY, Chief Judge.

Petitioner-appellant Gilbert Nieto appeals from the district court's order dismissing his petition for a writ of habeas corpus and

adopting the findings and recommendations of the Magistrate. Petitioner was convicted in a New Mexico state district court, following a jury trial, of the assault, battery and armed robbery of Francisco Rodriguez. We affirm.

## I.

### THE FACTUAL AND PROCEDURAL BACKGROUND

On the night of January 13, 1983, Francisco Rodriguez and his cousin, Mauricio Carreon, were playing video games at a local 7–Eleven store in Albuquerque. As the two left the store, they were abducted by three men and forced into Rodriguez' truck. Rodriguez was directed to drive to an area near the Rio Grande River, while two of the attackers pointed weapons at him.

Upon their arrival at the river bank, the three men took Rodriguez' money, class ring, Levi jacket and watch. Rodriguez and Carreon were ordered to lie down in the dirt while the three attempted to start the truck and leave. During this time, Rodriguez and Carreon jumped up and fled. Both Rodriguez and Carreon notified the police of the incident that evening and gave Albuquerque Police Officer, Jean Kurdoch, descriptions of the three assailants. Rodriguez told Officer Kurdoch that one of the attackers was a Hispanic male approximately 30 years old, with a playboy bunny tattooed on his neck and tattoos of women on his right forearm.

Officer Kurdoch, relying on Rodriguez's description of the attacker with a playboy bunny on his neck, compiled a photo array from the identification bureau of the Albuquerque Police Department. This array included a picture of Nieto, as well as one other Hispanic male with a playboy bunny tattoo on his neck. When Rodriguez was presented with the photo array approximately two months after the incident, he identified Nieto as the oldest of the three attackers.

At trial, the state's case consisted of only the testimony of Officer Kurdoch and Rod-

riguez. Neither the State nor the defense called Carreon as a witness. Nieto himself was the only defense witness. He testified that he did not know where he was on the day or night of January 13, 1983. He further testified that he was arrested on February 22, on a state charge of breaking and entering.[1] Nieto also showed his tattoos located on his neck and right forearm to the jury. The jury returned a verdict of guilty on all counts.

In Nieto's direct appeal to the New Mexico Court of Appeals, the following issues were raised: (1) whether the prosecutor's references to matters not introduced in evidence and to Nieto's mug shot denied Nieto his right to due process and a fair trial; (2) whether the closure of the courtroom during Rodriguez's testimony denied Nieto's right to a public trial. The Court of Appeals affirmed and the New Mexico Supreme Court denied certiorari.

## II.

### ANALYSIS

Nieto asserts in his petition for habeas relief that he was denied a fair trial as a result of the State's references to his mugshot and incarceration, to a non-testifying witness, and to a psychological phenomenon called "object focus." He also contends that his right to a public trial was violated when the trial court closed the courtroom during the testimony of Rodriguez. The State responds that two of these issues have been procedurally waived, thus barring federal court consideration of these issues. Furthermore, the State argues even if the issues presented by Nieto are not barred, they are meritless.

### A.

### PROCEDURAL DEFAULT AND WAIVER

■ The State relies on *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), and argues that Nieto has procedurally defaulted and waived any claims of

---

1. Nieto was later convicted of this charge and was incarcerated at the time of trial.

error as to references made by the prosecutor during the trial to Nieto's mug shots and incarceration. The State asserts that Nieto procedurally defaulted and waived any right to claim error as to the prosecutor's references to the phenomenon called "object focus." We agree that the claim relating to references to Nieto's prior incarceration was waived; we hold, however, that the claims relating to references to mug shots and "object focus" were preserved by Nieto.

The *Engle* case is inapposite. There the issue was whether the petitioners could proceed with their federal habeas proceeding when they failed to raise and preserve their constitutional issue in the state courts by compliance with a state procedural rule for contemporaneous objections to jury instructions. *Id.* at 124–125, 102 S.Ct. at 1570. Here the State relies on *Engle* to argue that Nieto failed to preserve the issues for federal habeas review by failing to assert contemporaneous objections during his trial. The New Mexico Court of Appeals, however, clearly addressed the merits of the constitutional issues concerning the references to Nieto's mug shot and "object focus."[2] I R. doc. 11, exh. "A", pp. 9–11. Thus, unlike the petitioners in *Engle*, Nieto is not barred from obtaining federal habeas review of the issues concerning the mug shot testimony and the prosecution's statements concerning "object focus" phenomenon.

■ On the other hand, the New Mexico Court of Appeals clearly stated that any error regarding the prosecutor's reference to Nieto's incarceration was not preserved for review. I R. doc. 11, exh. "A", p. 10. Nieto has not offered any explanation for his counsel's failure to object to the State's reference to his incarceration. In fact, Nieto testified that he was incarcerated at the time of his trial and his counsel mentioned this fact during closing argument. Nieto has failed to show cause for the default and any actual prejudice from the alleged

error. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *See also United States v. Hay,* 527 F.2d 990, 997 (10th Cir.1975) ("[a]ny error in admitting evidence is cured by the defendant's admission concerning the same facts"). Therefore, this issue is not subject to review through federal habeas proceedings. *Harris v. Reed,* 109 S.Ct. at 1042–44.

### B. MUG SHOT TESTIMONY

Nieto argues that Officer Kurdoch's references to his mug shot during her testimony on direct examination is "prejudicial on its face." Appellant's Brief at p. 10. Officer Kurdoch testified that mug shots are made of people who are arrested. Therefore, prejudice to Nieto arose from the jury's consequent awareness of his prior arrest and possible past convictions.

■ However, in light of Nieto's own testimony that he had been previously arrested and was presently incarcerated, and his counsel's references to his prior arrest and mug shot during closing argument, we cannot agree that Neito was denied a fair trial or prejudiced by the officer's mug shot testimony. *See Tapia v. Rodriguez,* 446 F.2d 410, 413–16 (10th Cir.1971) (defendant's counsel's failure to object to testimony and references to a "mug book" did not constitute ineffective assistance of counsel nor constitute fundamental error). *Fish v. Cardwell,* 523 F.2d 976, 977–78 (9th Cir. 1975), *cert. denied,* 423 U.S. 1062, 96 S.Ct. 801, 46 L.Ed.2d 654 (1976) (reference to defendant's mug shot is not prejudicial error where defendant's own counsel elicited the statements).

### C. "OBJECT FOCUS" REFERENCE

Next, Nieto asserts the prosecutor's statements during closing about a psychological phenomenon called "object focus" deprived him of due process. Specifically, Nieto argues the State's reference to "ob-

---

**2.** Although the New Mexico Court of Appeals' opinion is ambiguous as to whether the issues complained of by Nieto were addressed on their merits or as procedurally barred, we are not restrained from deciding the merits of those

issues here because the state appeals court interchangeably discussed both methods of disposing the issues. *Harris v. Reed,* —— U.S. ——, 109 S.Ct. 1038, 1042–44, 103 L.Ed.2d 308 (1989).

ject focus" was not supported by any evidence and was used to improperly distract from Rodriguez' incorrect or incomplete discriptions of tattoos worn by his attacker. The State responds that Nieto's failure to object at trial constituted procedural default.[3] In addition, the State argues that Nieto's counsel disavowed any belief that an error was committed by his statements during closing that he had no objection to the "object focus" references and sought to use the phenomenon to Nieto's advantage.

It is generally accepted that counsel during closing must confine their argument to admitted facts in evidence. However, to infer that the State's reference to "object focus" was improper does not necessarily establish that the reference itself deprived Nieto of due process. For an improper remark to cause reversal, it must also be prejudicial; infringement of due process by such conduct must involve unfairness in the trial.

■ Because Nieto's counsel disavowed any objection to the "object focus" phenomenon during his closing, and in fact used the phenomenon to Nieto's own advantage, it would be difficult for us to find that the State's reference was prejudicial. *Cf. Mason v. United States,* 719 F.2d 1485, 1489 (10th Cir.1983) (failure of defendant's counsel to object during closing tends to indicate there was not a serious objection to the argument). Just as a defendant cannot

complain of any error he invites upon himself, *United States v. Hooks,* 780 F.2d 1526, 1535 (10th Cir.1986), he cannot take advantage of an alleged error brought on by the State during trial and then later complain about it in a habeas proceeding. Review of the record convinces us that Nieto was not prejudiced or denied a fair trial by its use. There is no showing by Nieto that he was prejudiced by the State's reference to "object focus" during the closing argument. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

## D. REFERENCES TO MAURICIO CARREON

Another alleged victim of the January 1983 incident, Mauricio Carreon, was referred to often by the State during the course of the trial, including what his testimony would be, even though he was not called to testify. In its opening statement the State made reference to Carreon's physical description and eventual photo identification of Nieto.[4] In addition, during Rodriguez' direct examination, the prosecutor questioned him about Carreon.[5] Finally, during his closing argument the prosecutor told the jury that Carreon would not come to the trial because he was deathly afraid. It is these references to Carreon

---

3. We have already determined that this argument is without merit. *See* Section II, A, *supra.*

4. The prosecutor stated:
   "... also provided to the police department at the time was a physical description by Francisco and Mauricio in terms of what these people looked like, II R., T. 3, 12/19/83 at 129–30, ... and evidence will also show that not only did Francisco Rodriguez make that selection, but at a separate point, Mauricio Carreon also made that same selection of photograph number five as being the person who assaulted them from the area of Central and University." II R., T. 3, 12/19/83 at 148–53. (The tape numbers are readings from the tape counter of a Dictaphone Model No. 2250).

5. These questions were asked concerning Carreon:
   Q: On that date did you have occasion to be with a friend of yours by the name of Mauricio Carreon?
   . . . .

Q: How did you know Mauricio?
. . . .
Q: How old is Mauricio?
. . . .
Q: Do you know where Mauricio is now?
. . . .
Q: Why won't Mauricio come?
. . . .
Q: Mr. Rodriguez, where were you with Mauricio on January 13th?
. . . .
Q: And was Mauricio also playing [the games]?
. . . .
Q: Where was Mauricio Carreon during this time?
. . . .
II R., T. 4, 12/19/83 at 340–55, 359 & 443.

which Nieto points to as denial of a fair trial.

After the prosecutor's opening statement, which contained comments about Carreon's physical description of Nieto, Nieto's counsel requested a bench conference. It was revealed that the State was not going to call Carreon as a witness. Nieto's counsel moved for a mistrial on the basis that the State interjected a confrontation problem arising from Carreon's alleged identification. The court denied the motion for a mistrial and reminded the jury that opening statements were not evidence.

In the court's opening instructions the jury was advised what was to be considered as evidence and that their verdict must be based only on the evidence and testimony heard at the trial. The court admonished the jury that opening statements by counsel were not evidence. Both the prosecutor and Nieto's counsel prefaced their openings by saying that their statements were not to be considered evidence.

■ We do not believe that the prosecutor's references to Carreon during his opening remarks denied Nieto a fair trial and caused the jury to disregard the instructions to not treat the opening statements as evidence. *See United States v. Humer*, 542 F.2d 254, 255 (5th Cir.1976); *see also Frazier v. Cupp*, 394 U.S. 731, 735–37, 89 S.Ct. 1420, 1422–23, 22 L.Ed.2d 684 (1969). We also feel that since it was Nieto's counsel who asked Officer Kurdock as to who had given her the descriptions used in developing the photo array (to which she responded that both victims gave her the description) there was not a persuasive argument for reversal.[6]

Nieto asserts that the questions regarding Carrion during Rodriguez' direct examination were prejudicial. Most of these questions were general in nature and provided background information about the armed robbery.[7] These questions were relevant to the circumstances of the crime. Nieto takes particular issue with the prosecutor's attempt to get Francisco to divulge why Carreon would not come to the trial. Nieto's counsel made an objection to this inquiry, which was sustained by the trial court, and the question was not answered.

■ In our view the unanswered question concerning why Carreon would not attend trial did not have any substantial likelihood of changing the jury's verdict, and we feel reversal is not required. *United States v. Glover*, 677 F.2d 57, 58 (10th Cir.1982). We note also that the court earlier instructed the jury that it could not consider any evidence to which an objection was sustained and could not speculate as to the answer of any question which the court ruled could not be answered. II R., T. 3, 12/19/83 at 22–29. The court's introductory instructions prevented Nieto from being prejudiced by the prosecutor's attempted inquiry. *Glover*, 677 F.2d at 58. Additionally, because the prosecutor's inquiry was isolated, we do not believe the jury's verdict was improperly influenced. *United States v. Begay*, 833 F.2d 900, 903 (10th Cir.1987).

During closing argument, Nieto's counsel said "Where is Mauricio? There was another witness. Where is he?" II R., T. 7, 12/20/83 at 372. In rebuttal, the prosecutor responded:

... What about Mauricio Carreon? That's right. Defense counsel could have subpoenaed him. I asked Francisco, "Where is Mauricio?" As I recall, he said, "He won't come." I know what's happening—the man is sixteen, seventeen years old. He's deathly afraid also, I'm sure.

II R., T. 7, 12/20/83 at 695–702. Counsel for defendant objected and the court sustained the objection. Nieto argues that while his inference regarding Carreon was proper, the State's response was improper and highly prejudicial.

■ While we agree that the prosecutor's comment that Carreon was "deathly afraid" to testify was clearly improper, we find no constitutional error on this point.

---

**6.** We note that Nieto's counsel did not object to Officer Kurdock's answer.

**7.** *See* fn. 6, *infra*.

Due process analysis in habeas cases focuses on the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Fairness of the trial is not generally determined on the basis of the prosecutor's statements or conduct standing alone, but must be viewed in context of the whole trial. *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The standard that governs in a habeas proceeding "is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

In the context of the entire trial we cannot agree that due process was denied. First, the State's comment about Carreon was in response to Nieto's counsel's statement implying that the State could have called Carreon to testify. Although this alone does not purge the impropriety of the statement, *see Young*, 470 U.S. at 12, 105 S.Ct. at 1044, it may affect the context in which the improper statement is viewed by the jury. Here, the prosecutor's statement was in response to Nieto's counsel's remark that Carreon, an alleged victim of the incident, was not called to testify. Although the prosecutor's comment that Carreon was deathly afraid was clearly improper, he did not comment on any other matter such as Carreon's physical description and photo identification of Nieto made to Officer Kurdoch during her investigation. Second, the court instructed the jury

that counsel's statements were not to be considered as evidence. Third, the trial court sustained Nieto's objection to the prosecutor's remark about Carreon being deathly afraid. Fourth, after reviewing the evidence against Nieto, we do not believe the prosecutor's improper closing statement tipped the scales in favor of the State. *See Robison v. Maynard*, 829 F.2d 1501, 1509 (10th Cir.1987). Thus, we hold that there was no due process violation by the remark.[8]

### E. THE CLOSURE OF THE TRIAL

Nieto argues that there was a "Closure of The Trial" during the testimony of the State's complaining witness, Rodriguez; that the trial judge offered to close the courtroom to all but the jury, the defendant, the attorneys and the court staff; that the court's ban deprived him of the support of his family and friends,[9] and also encompassed the press and the general public, resulting in denial of Nieto's right to a public trial in violation of his Sixth Amendment rights and of the New Mexico Constitution.[10]

Immediately before commencement of the trial a hearing was conducted in the trial judge's chambers. This was attended by the trial judge, the prosecutor, Nieto's attorney, Rodriguez, and Juan Benavidez, a friend of Rodriguez who acted as his interpreter. The court held this hearing because the State had brought to the court's attention the fact that Rodriguez was worried about testifying since two of the assailants were still at large.[11] The trial

---

8. Nieto's reliance on *Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir.1983) is misplaced. In *Hutchins*, the petitioner claimed a Sixth Amendment violation arising from the prosecutor's reference in closing argument to an eyewitness who was afraid to testify because of fear of retribution. *Id.* at 515. Here, Nieto claims no Confrontation Clause infringement.

9. The record does not show how many relatives were present.

10. We discuss only the federal constitutional claim since the assertion of violation of the State Constitution is not cognizable under 28 U.S.C. § 2254(a). *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984).

11. The fear of Rodriguez was discussed in the following colloquy:
    COURT: Mr. Rodriguez, have you been contacted by anybody? II R., T. 1 at 18–19.
    INTERPRETER: He's afraid because of what happened to him. *Id.* at 23–24.
    COURT: Why won't he testify in this matter? *Id.* at 25.
    INTERPRETER: He's [Rodriguez] afraid of the other ones. Because the way he understood that if he went to testify for, whatever, Nieto, the way they would do it is to put one in this room, so they would see him. But I understand they have to be face to face. He said, you know, he's going to be contacting his

judge told Rodriguez he had no choice as to whether he would testify and that he was required to do so on behalf of the State. The judge told Rodriguez that if he did not testify he would be sent to jail and that he would get all the protection that he is entitled to after he testified.[12]

Rodriguez was then asked by the judge whether he would testify or go to jail. Rodriguez said he guessed he would go to jail. The judge explained there were thousands of victims in the same position that he was in and that since he had been on the bench, he had not seen anyone who testified as a victim beaten up by a defendant. The judge explained that the State had decided to bring the charges.[13]

After some further discussion about Rodriguez' concern with identifying Nieto in a photo array, the judge repeated that Rodriguez would be required to go to jail if he did not testify. The judge stated that he "understands Francisco's worries, but that he is not convinced that they are legitimate because retaliation doesn't happen to most

> relatives, whatever, and they go after him when to testify to him. *Id.* at 35–38.
> COURT: Why is he under the impression that this will happen to him? *Id.* at 39.
> INTERPRETER: He says that because they only have one imprisoned and the other two are still out, he's going to be fighting with them. And they told him that they would give him protection and that the police would be with him all the time.... *Id.* at 43–46.
> COURT: Well, is he sure, is he positive, he hasn't been contacted by anyone that's been telling him this? *Id.* at 49.
> INTERPRETER: He just said that his folks told him just to forget about it. *Id.* at 51–54.

**12.** The court's assurance was given during the following colloquy:
> INTERPRETER: Well, that he's afraid about the other guys who know. He's ... this one can't do nothing to him. It's the other two they haven't caught ... that did it to him. *Id.* at 74–76.
> COURT: Well, if he's worried about his relatives, about his relatives being here, his relatives won't be in the courtroom. I won't let his relatives be in the courtroom. *Id.* at 76–78.
> INTERPRETER: [Nieto] can always get in contact with them in town. Remember the guy that we.... *Id.* at 79–80.

**13.** This discussion between the trial judge and the interpreter was as follows:

people who testify in court, and secondly, there is no guarantee that Nieto wouldn't do anything once he got out of jail."

After the judge instructed Rodriguez and Benavidez to confer alone in another room about whether Rodriguez would testify or go to jail, the following colloquoy took place between the judge, the prosecutor and Nieto's attorney:

JUDGE: Well, we'll see what again, we're waiting for him to decide what he wants to do and of course it can be up to the State too, but if the State doesn't dismiss the case, the court's intention would be to send him to jail.

PROSECUTOR: Judge, I would have great difficulty with doing that.

JUDGE: Okay. Again, I would make sure he wasn't around any of the other prisoners if that was your worry that he would be contacted or hurt.

PROSECUTOR: Well, judge could I have a few moments to discuss this with my supervisor downstairs, could I have another moment?

> INTERPRETER: [Rodriguez] is concerned that he would have to testify against Nieto when the other two are still loose. They know were he lives. *Id.* at 100–103.
> COURT: Does he know who the other two people are? *Id.* at 103.
> INTERPRETER: He would recognize them if he sees them. *Id.* at 105.
> COURT: Has he seen them since this happened? *Id.* at 106.
> INTERPRETER: He saw them and called the police but they were unable to do anything about it. *Id.* at 105–108.
> COURT: What makes you think the others know where you live? *Id.* at 121–122.
> INTERPRETER: Because Nieto knows where he lives and Nieto's brothers know where he lives. *Id.* at 123–125.
> COURT: Would you explain to him that when he testifies in the courtroom, the only one that's going to be in the courtroom is Nieto, and the jury and there's not going to be anyone else and we'll let him be brought in from a place where nobody's going to see him come in or out and he won't have to be in touch with the relatives, or near the relatives, or anything like that. Does he understand that? *Id.* at 126–30.
> INTERPRETER: He said well the police told him to buy himself a gun. *Id.* at 138.
> COURT: What's he saying? *Id.* at 142.
> INTERPRETER: He's going to think about it. *Id.* at 142.

JUDGE: Okay, sure. And as I indicated I don't know how long I'd keep him in jail, but I'd keep him in jail at least until tomorrow.

PROSECUTOR: Okay. Thanks judge. I'll go down and talk to Mr. Gazowski.

After Rodriguez and Benavidez returned, the following discussion among the parties took place:

JUDGE: Okay we're in chambers now out of the presence and hearing of the jury again and Mr. Velasquez would you ask Mr. Rodriguez what he wants to do now—

PROSECUTOR: Ah, Mr. Benavidez.

JUDGE: Oh, Mr. Benavidez, I'm sorry.

INTERPRETER: .... Let's go ahead and do it.

JUDGE: Are you willing to testify?

INTERPRETER: I don't have another choice.

JUDGE: Okay, let's go ahead and do it. ....

JUDGE: Okay, and let me—is Mr. Benavidez, is he going to be the translator?

NIETO'S ATTORNEY: No, we'll have Ms. Decourt as translator judge.

JUDGE: Okay, okay. And if there is some confusion about what he's suppose to do you'll tell him that in no way did the court intend to indicate previously that he was to do anything but to tell the truth and to the best of his memory and that's all I want him to do to the best of his memory. Would you tell him that. (Interpreter translates this to Rodriguez).

PROSECUTOR: And judge can we also make certain that no relatives of the defendant would be in the courtroom during the testimony of the victim?

JUDGE: Yes, we'll make sure of that and if he wants to—

INTERPRETER: Judge, can I ask you something. These relatives aren't going to be there, right?

JUDGE: No, his relatives will not be present when he's testifying and if he wants he can wait in our court reporter's office until it's time for him to testify. We'll show you where that is and then we'll bring him into the courtroom through the jury room when he comes in to testify and then we'll make sure he gets out without having to see them.

INTERPRETER: Okay.

JUDGE: Okay?

Before Nieto's counsel began cross-examination of Rodriguez, he requested that the courtroom be reopened so that Nieto's sisters and other relatives could attend the trial. Nieto's counsel's basis for the request was that Rodriguez testified on direct that he was not afraid and there was no evidence that anyone had threatened him. The court denied the request stating, *"The hearing indicated Mr. Rodriguez was worried about his safety ...", "I don't know what he meant by afraid ... I'll keep the courtroom closed until such time as he's finished testifying. At that time the defendant's relatives will be at liberty to enter the courtroom."* (emphasis added). Nieto's counsel stated that was over his objection. II R., T. 5, 12–19–83, 171–186. During cross examination, Rodriguez testified that neither Nieto nor Nieto's family or friends contacted him. II R., T. 6, 12–19–83, 24–26.

The Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy and public trial ..." The Fourteenth Amendment guarantees defendants in state prosecutions a public trial. *In re Oliver*, 333 U.S. 257, 266–73, 68 S.Ct. 499, 504–07, 92 L.Ed. 682 (1948). The right to a public trial belongs to the accused, not to the public. *Estes v. Texas*, 381 U.S. 532, 588–89, 85 S.Ct. 1628, 1662–63, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring); *see also Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984).[14]

14. We note that here there has been no argument of nonretroactivity of *Waller.* It appears that *Waller* would apply to the instant case since the convictions and sentences challenged in this federal habeas case were not final on appeal in the New Mexico courts until after the May 1984

decision in *Waller.* The State Court of Appeals opinion affirming the convictions and sentences was filed on September 6, 1984. Thus under the test of finality recently reaffirmed in *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 1067, 103 L.Ed.2d 334 (1989), the Nieto convictions and

The right to an open trial, however, may give way in certain cases to other rights or interests such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. *Waller*, 467 U.S. at 45, 104 S.Ct. at 2214; *see e.g. Douglas v. Wainwright (Douglas I)*, 714 F.2d 1532, 1544–45 (11th Cir.1983) (exclusion allowed of public other than defendant's family and press from courtroom to protect a testifying rape victim-witness from insult and embarrassment), *vacated and remanded*, 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), *reinstated, (Douglas II)* 739 F.2d 531 (11th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *United States v. Hernandez*, 608 F.2d 741, 747–48 (9th Cir.1979) (spectators excluded from courtroom during examination of witness who was in fear of his own personal safety after being threatened); *United States ex rel. Orlando v. Fay*, 350 F.2d 967, 971 (2nd Cir.1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966) (spectators except press and the bar excluded to maintain order in the courtroom); *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1274 (2nd Cir.) *cert. denied*, 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975) (proper to exclude public from courtroom during testimony of a confidential informant).

A defendant's Sixth Amendment right to a public trial and the purposes of the guarantee were analyzed by the Court in *Waller*, 467 U.S. at 44–47, 104 S.Ct. at 2214–15. In the context of a total closure of a suppression hearing, the Court stated that the applicable rule was that from *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984):

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a re-

viewing court can determine whether the closure order was properly entered.

In *Waller*, the Court held that the closure of the defendant's entire suppression hearing was improper. *Id.*, 467 U.S. at 48, 104 S.Ct. at 2216.

Nieto argues that we should apply the "overriding interest" standard articulated in *Waller* to the facts here. He asserts there was a total closure during the testimony of Rodriguez, relying on the trial judge's comment made at the pre-trial hearing that during Rodriguez' testimony only the defendant and the jury would be present. II R., T. 1 at 126–30. We do not feel the record shows a total closure of the courtroom, with only the defendant, the jury and, of course, the judge and court staff present. The New Mexico Court of Appeals observed that the record affirmatively indicated that only Nieto's relatives were excluded from the courtroom during Rodriguez' testimony. I R. doc. 11, exh. "A", p. 6. The U.S. Magistrate considered affidavits submitted by the trial prosecutor and Nieto's trial counsel in addressing the issue of the extent of closure. In his proposed findings, the Magistrate concluded that there was no basis to disregard the New Mexico Court of Appeals finding that the closure only affected Nieto's relatives during Rodriguez' testimony. I R. doc. 24, p. 5. The Federal District Court fully adopted the Magistrate's proposed findings and recommendations in the habeas proceeding. I R. doc. 26.

Under the habeas corpus provisions of 28 U.S.C. § 2254, federal courts are required to afford a state court determination of a factual issue a "presumption of correctness." *Sumner v. Mata*, 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). Such a presumption favoring state court factual findings applies unless certain stated exceptions are shown to exist or are admitted. 28 U.S.C. § 2254(d)(1)–(8). A federal habeas court may disregard the state court finding if the petitioner "establish[es] by convincing evidence that the factual determination by the State court was

---

sentences were not final before the *Waller* opinion was rendered and it applies. *See also San-*

*tos v. Brown*, 596 F.Supp. 214, 218–19 (D.R.I. 1984) (*Waller* applies retroactively).

erroneous." *Ewing v. Winans,* 749 F.2d 607, 609 (10th Cir.1984). Here we agree with the Magistrate and the District Court that we should accept the finding of the New Mexico Court that the closure of the trial was partial, with exclusion of only Nieto's relatives during the testimony of Rodriguez.

In *Waller,* in the context of the total closure of an entire suppression hearing of several days, the Court applied the "overriding interest" standard. We note, however, that the Ninth and Eleventh Circuits have applied a less stringent test of a "substantial reason" where partial closures are held necessary. *See United States v. Sherlock,* 865 F.2d 1069, 1077 (9th Cir. 1989); *Douglas I,* 714 F.2d at 1540–41 (11th Cir.1983). We are persuaded that we should apply the less stringent "substantial reason" test in the context of this habeas case in determining whether there was a violation of the petitioner-appellant's right to a public trial, by the partial closure ordered during the testimony of Rodriguez, when relatives of the defendant Nieto were excluded from the courtroom.

In making the determination whether there was an infringement of the public trial right, we consider the interests identified by the Supreme Court which are protected by the Sixth Amendment right to a public trial. These include the opportunity of interested spectators to observe the judicial system, the improvement of quality of testimony, the inducing of unknown witnesses to come forward with relevant testimony, insuring that the trial judge and prosecutor perform their duties responsibly, and discouraging perjury. *See Waller, supra,* 467 U.S. at 46, 104 S.Ct. at 2215; *Gannett Co. v. DePasquale,* 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979).[15] Moreover, in *In re Oliver,* 333 U.S. 257, 271–72, 68 S.Ct. 499, 506–07, 92 L.Ed. 682 (1948), the Court noted that "without exception courts have held that

an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged...." (footnote omitted); *see Aaron v. Capps,* 507 F.2d 685, 687–88 (5th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 153, 46 L.Ed.2d 112 (1975); *State v. Ernest Klem,* 438 N.W.2d, 798, 803 n. 5 (N.D.1989).

■ We are persuaded that no violation of petitioner Nieto's Sixth Amendment right to a public trial occurred. The State trial court held a hearing just before the commencement of trial, as noted, attended by the prosecutor, Nieto's attorney, the State's witness Rodriguez, and his friend Benavidez who acted as his interpreter. The colloquies at the hearing are quoted at some length in the preceeding text and footnotes. *See* notes 11, 12, and 13. There are clear references to Rodriguez' fear or concern about his two other assailants who had not been apprehended. There was worry because Nieto knew where Rodriguez lived and "Nieto's brothers know where he lives." The police had advised Rodriguez to buy himself a gun.

The prosecutor requested that it be made certain that no relatives of Nieto would be present during the victim's testimony; and then the interpreter for Rodriguez repeated the inquiry: "These relatives aren't going to be there, right." The judge then said the relatives would not be present while Rodriguez testified and that he could wait in the court reporter's office until it was time to testify and then "we'll make sure he gets out without having to see them." Finally, the reason for the partial closure was made clear when the judge denied the request of Nieto's counsel to admit Nieto's sisters and other relatives during cross-examination of Rodriguez, the judge stating: "The hearing indicated Mr. Rodriguez was worried about his safety...."

We are convinced that the trial judge had "a substantial reason for the closure."

---

15. In *Waller* the Court stated that the parties did not question the consistent view of the lower federal courts that the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee. 467 U.S. at 49, 104 S.Ct. at 2217.

We are persuaded that once a violation is found of a defendant's right to a public trial, the defendant should not be required to prove prejudice because of infringement of the interests protected by the Sixth Amendment guarantee. *See Douglas I,* 714 F.2d at 1542.

*United States v. Sherlock,* 865 F.2d at 1077. He conducted a hearing where the circumstances were discussed and tailored his order to what relief he felt needed, exclusion of the relatives of Nieto during Rodriguez' testimony, with others present and no secrecy imposed on the proceedings. We hold that Nieto's constitutional right to a public trial was not violated by the partial closure of the trial in light of the circumstances of this record.

## III

Accordingly, the judgment of the District Court denying the writ is

AFFIRMED.